

SEP 1 1 2002



CLERK, U.S. DISTRICT COURT
STERN DISTRICT OF CALIFO

1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8           FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10 CHRIS STEVENS, et al.,              CIV-S-01-0675 DFL PAN P

11      Plaintiffs,

12      v.                            MEMORANDUM OF OPINION AND
                                              ORDER
13
JERRY L. HARPER and the
14 CALIFORNIA YOUTH AUTHORITY,

15      Defendants.

16

17

18      This case is a proposed class action under Fed. R. Civ. P.

19 23(b)(2) in which the plaintiffs ask the court to issue

20 injunctive and declaratory relief against the California Youth

21 Authority ("CYA") concerning a wide range of CYA policies and

22 programs at all of the CYA's eleven correctional facilities.  The

23 nine named plaintiffs are currently incarcerated at six different

24 CYA correctional facilities and assert claims based on the CYA's

25 alleged violations of the First and Fourteenth Amendments, the

26 Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et

seq., the Rehabilitation Act, 29 U.S.C. § 794, and the Religious

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1.[1]

Plaintiffs seek to bring a class action on behalf of all CYA wards to reform the CYA's policies, procedures, and practices in eleven broadly defined areas relating to: (1) the physical safety of wards, (2) the confinement of wards in lock-up units, (3) administrative lockdown procedures,[2] (4) the upkeep of the physical facilities, (5) discipline and segregation procedures, (6) medical and dental care, (7) mental health care, (8) educational and rehabilitative programming, (9) confidentiality of attorney-client communications, (10) the treatment of disabled wards, and (11) access to religious services and materials.

Defendants move to dismiss the majority of the named plaintiffs' individual claims on the grounds that the named plaintiffs lack standing to bring suit, do not allege sufficient imminent harm to entitle them to injunctive relief, and fail to plead legally sufficient claims.  Defendants also move for summary judgment on the claims of Amy Stephens for lack of standing and mootness.  Plaintiffs have filed a cross motion for class certification under Fed. R. Civ. P. 23(b)(2).  Plaintiffs seek to certify a class consisting of "[a]ll wards under the

---

[1] Plaintiffs agreed at oral argument to voluntarily dismiss wards Michael Resendiz ("Resendiz") and Randy Jones ("Jones") from this action.  Accordingly, the claims of Resendiz and Jones are hereby dismissed.

[2] Administrative lockdown "is a program restriction of a group of wards, living units, or the entire facility due to an operational emergency that threatens the safety of wards and/or staff."  (Second Amended Complaint ("SAC") at ¶ 48).

jurisdiction of the CYA, who are at the time of the filing of this action, or will be during the pendency of the suit, confined at one of the CYA's eleven institutions." (Pls.' Motion for Class Cert. at 1).

## I. Factual Background

The California Youth Authority ("CYA") is a department of the California Youth and Adult Correctional Agency and administers the largest youth correctional system in the nation.[3] (Parks Decl. Exh. A). The statutory purpose of the CYA is "to protect society from the consequences of criminal activity" and to provide "correction and rehabilitation [to] young persons who have committed public offenses." Cal. Welf. & Inst. Code § 1700. The CYA currently houses over 6000 wards, ranging in age from 12 to 25, in eleven separate youth correctional facilities, four youth conservation camps, and two residential drug treatment programs located throughout the state of California.[4] (Parks Decl. Exhs. B-E). The average age of CYA wards is 19 years old, and wards remain in the CYA's custody for an average of 29.3 months. (Id. Exh. D).

The majority of CYA wards are committed to the CYA by a juvenile court through a wardship proceeding. See Cal. Welf. &

---

[3] Defendant Jerry Harper is the current Director of the CYA and is allegedly responsible for the "operation of all CYA staff and facilities, including decisions concerning budget[ing], staff deployment, programming, and staff training that directly affect plaintiffs and the plaintiff class." (SAC at ¶ 26).

[4] Only the eleven CYA youth correctional facilities are at issue in this litigation.

1  Inst. Code §§ 602, 731; Spar Decl. at ¶ 2.  However, a minority

2  of wards (3.2% of the total ward population) are in CYA custody

3  based on adult criminal convictions.  (Spar Decl. at ¶ 2).

4  Approximately 120 wards have been directly committed to the CYA

5  after conviction on adult criminal charges; another 80 wards have

6  been transferred to the CYA by the California Department of

7  Corrections.  (Id.)

8       The nine plaintiffs in this case are currently housed in six

9  of the CYA correctional facilities at issue in this litigation.

10  Plaintiffs Arlon Carroll, Khalil Jindherd, Angel Martinez, David

11  Owens, and Darren Striplin are incarcerated at the N.A.

12  Chaderjian Youth Correctional Facility in Stockton, California

13  ("Chaderjian").  (SAC at ¶¶ 10, 14, 18, 21, 25).  Amy Stephens is

14  confined at the Ventura Youth Correctional Facility ("Ventura");

15  Jermaine Brown is confined at the Fred C. Nelles Youth

16  Correctional Facility in Whittier, California ("Nelles");  Chris

17  Stevens is confined at the Northern Youth Correctional Reception

18  Center and Clinic in Sacramento ("NYRCC"); and Raymon Davis is

19  confined at the Herman G. Stark Youth Correctional Facility in

20  Chino, California ("Stark").  (Id. at ¶¶ 5, 7, 12, 24).

21  Plaintiffs Chris Stevens and Khalil Jindherd are both over 18

22  years of age and, unlike the other plaintiffs, are in CYA custody

23  based on prior criminal convictions.  (Shepard Decl. at ¶ 4).

24              II. Plaintiffs' Submissions

25       In support of their request for class certification and

26  individual and classwide equitable relief, plaintiffs rely mainly

1  on the unverified allegations in their amended complaint.

2  Plaintiffs have not submitted any declarations or depositions to

3  establish their entitlement to equitable relief or class

4  certification, nor have they requested an evidentiary hearing to

5  clarify these issues.

6      Instead, plaintiffs have provided the court with audit

7  reports reviewing three of the eleven different CYA correctional

8  facilities at issue in this lawsuit, including an October 2000

9  review of Stark, a February 2000 review of Preston, and a January

10  2001 review of Nelles.  (Parks Decl. Exhs. E-G).  These audit

11  reports are prepared by the state Inspector General's Office

12  after an extensive evaluation of the correctional facility.  They

13  assess the individual facility's compliance with governing state

14  statutes and the regulations outlined in the CYA's Institutions

15  and Camps Branch Manual ("I&C Manual"), identify areas that need

16  improvement, and recommend changes in policies and procedures for

17  the facility's management to adopt.  In addition, plaintiffs have

18  submitted a December 3, 2001 letter from defendant Jerry Harper

19  responding to an omnibus grievance filed on behalf the named

20  plaintiffs as well as twenty-five other CYA wards by plaintiffs'

21  counsel ("Harper Letter").[5]  (Parks Decl. Exh. I).  The Harper

22

23      [5] Defendants argue that the Harper letter is an offer of
    compromise which is not admissible under Fed. R. Evid. 408.
24  However, the letter makes no reference to settlement of claims.
    Defendants also argue that the audit reports are confidential
25  under a privilege created by Cal. Evid. Code § 1040.  But
    plaintiffs bring claims under federal law, and accordingly, state
26  privilege law does not apply, and defendants do not establish a
    privilege recognized by federal common law for the audit reports.
    See Fed. R. Evid. 501.

1  Letter responds in detail to the wards' allegations of
2  mistreatment, explaining the CYA's policies and procedures and
3  the CYA's version of the events underlying the wards' complaints.
4  (Id.)  For the most part, the Harper Letter denies the wards'
5  individual allegations of mistreatment as well as the plaintiffs'
6  broad allegations of institutional mismanagement and operational
7  failure.  (Id.)  Other than the three audit reports and the
8  Harper Letter, plaintiffs have provided the court with no other
9  materials that address the specific conditions of confinement
10 faced by the named plaintiffs at the particular CYA facilities
11 where they are currently housed.

12      Plaintiffs also rely on general administrative and
13 legislative materials that evaluate the CYA on an institution-
14 wide level.  For example, plaintiffs submit a July 5, 2001 report
15 assessing the CYA's mental health care services ("Mental Health
16 Report").[6]  (Id. Exh. N).  The Mental Health Report reviews CYA
17 procedures and practices in areas ranging from suicide prevention
18 to staff recruitment and suggests ways in which the CYA can
19 improve its provision of mental health care services.  (Id.)
20 Plaintiffs have also submitted a transcript of a May 16, 2000
21 hearing before the California Senate and Assembly Committees on
22 Public Safety regarding conditions at the CYA ("Joint Oversight
23 Hearing Transcript").  (Id. Exh. H).  The hearing involved
24 testimony by eleven witnesses, including CYA executive officials,
25
26      [6] The report was prepared by independent consultants at the
   CYA's request.  (Mental Health Report at 3, Parks Decl. Exh N).

legal advocates for CYA wards, a former CYA ward, and the parent
of a current CYA ward.  The testimony focused on: (1) the
prevalence of gang influence at CYA facilities and the wards'
constant fear for their personal safety, (2) uneven and
inadequate programming at some CYA institutions, and (3) the need
for strong leadership and consistent policies at the CYA.  (Id.
Abstract of Hearing).  However, plaintiffs have not provided the
court with administrative materials that outline the CYA's
current policies, procedures, and practices in many of the areas
covered by their comprehensive class claims.[7]

Finally, plaintiffs submit newspaper articles identifying
various abuses at the CYA.  (Id. Exhs. I-M).  The most recent of
these articles date from May 2000 and discuss the state
investigation into the CYA, a probe that culminated in the May
16, 2000 fact-finding hearing before the Senate and Assembly
Public Safety Committees.  (Id. Exhs. K, M).

### III. Standing to Seek Equitable Relief

A.   Constitutional and Equitable Requirements

In a proposed class action such as this one where the
plaintiffs seek sweeping injunctive relief, questions relating to
the named plaintiffs' standing and entitlement to equitable

---

[7] Plaintiffs have submitted a table of contents of the CYA's
current I&C Manual and limited sections of the I&C manual dealing
with restriction of wards from religious programs and minimum
requirements for wards in lockup units.  (Parks Decl. Exh. O).
Plaintiffs also rely on a May 2000 summary report compiled by the
Department of Youth Authority Special Unit Lock-up/Redirect
Program Committee that describes the CYA's lock-up policies and
procedures.  (Parks Decl. Exh. P).

relief, the propriety of class certification, and the availability of systemwide relief will often overlap.  <u>See</u> <u>Armstrong v. Davis</u>, 275 F.3d 849, 860 (9th Cir. 2001).  Although these inquiries may intersect, standing and entitlement to equitable relief are threshold jurisdictional requirements that must be satisfied prior to class certification.  <u>See</u> <u>Prado-Steinman v. Bush</u>, 221 F.3d 1266, 1280 (11th Cir. 2000)("[A]ny analysis of class certification must begin with the issue of standing . . . [o]nly after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others.").

There are two distinct components to the standing inquiry when a plaintiff requests prospective equitable relief.  First, in order to satisfy the constitutional requirements for standing, the plaintiff must demonstrate a credible threat of future injury which is sufficiently concrete and particularized to meet the "case or controversy" requirement of Article III.  <u>See</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992); <u>City of Los Angeles v. Lyons</u>, 461 U.S. 99, 101-04 (1983).  And second, to establish an entitlement to injunctive relief, the plaintiff must allege not only a likelihood of future injury, but also show an imminent threat of irreparable harm.  The imminent threat showing is a separate jurisdictional requirement, arising independently from Article III, that is grounded in the traditional limitations

on the court's power to grant injunctive relief.[8]  See Lyons, 461
U.S. at 111 (the preconditions for equitable relief, including
the requirement that the plaintiff face a real and immediate risk
of personal harm, should not be slighted); Hodgers-Durgin, 199
F.3d at 1042 (the court may not exercise jurisdiction over a suit
for equitable relief unless the plaintiff demonstrates a
likelihood of imminent and irreparable injury, a necessary
prerequisite for such relief).

     "In general, injunctive relief is 'to be used sparingly, and
only in a clear and plain case,'" especially when the court is
enjoining the conduct of a state agency.  Gomez v. Vernon, 255
F.3d 1118, 1128 (9th Cir. 2001)(quoting Rizzo v. Goode, 423 U.S.
362, 378 (1976)).  The rigorous preconditions to such injunctions
reflect both federalism and separation of powers principles.  An
injunction of a state agency ordered by a federal court affects
the balance between the state and federal governments.  See,
e.g., Hodgers-Durgin, 199 F.3d at 1042, 1044 ("federalism
concerns may compel greater caution . . . in considering a
request for injunctive relief" against a state entity).

---

     [8] Plaintiffs must also establish a likelihood of imminent
injury in order to present a ripe claim for declaratory relief.
See Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1044 (9th Cir.
1999) (explaining that "the ripeness requirement serves the same
function in limiting declaratory relief as the imminent-harm
requirement serves in limiting injunctive relief," and that
"[t]he named plaintiffs' failure to establish a likelihood of
future injury" will not only bar injunctive relief but also
render "their claim for declaratory relief unripe.").  Therefore,
where the named plaintiffs fail to establish imminent injury for
the purposes of injunctive relief, their related claims for
declaratory relief must be dismissed as unripe.

1  Moreover, such an injunction may inject the court into broad
2  administrative and legislative policymaking committed to other
3  branches of government with superior competence.  Because the
4  role of the courts is limited to providing relief "to claimants,
5  in individual or class actions who have suffered, or will
6  imminently suffer, actual harm," whereas general questions of
7  institutional management and reform must be left to the
8  legislative and executive branches, plaintiffs must do more than
9  allege that they are housed in a governmental institution that is
10 "not organized or managed properly" to seek injunctive relief.
11 Lewis v. Casey, 518 U.S. 343, 350-51 (1996).  Thus, the
12 requirement that plaintiffs establish a particularized risk of
13 imminent injury before seeking prospective relief ensures that
14 federal courts refrain from intervening in the administration of
15 state institutions absent a clearly defined legal dispute.  See
16 id. (if plaintiffs could invoke judicial intervention without a
17 showing of imminent harm, the distinction between the
18 adjudicative role of the courts and the managerial role of the
19 executive branches "would be obliterated").  The requirement
20 ensures that the plaintiffs may obtain actual redress from the
21 court where necessary, while otherwise preserving the discretion
22 of state executive and legislative officials to make policy and
23 funding decisions based on their expertise and administrative
24 priorities.

25

26     These concerns are particularly relevant in this case,

1 because the CYA's policies and procedures have been subject to
2 recent legislative and executive scrutiny.  (Joint Oversight
3 Hearing Transcript, Parks Decl. Exh. H).  Plaintiffs rely heavily
4 on these legislative and executive materials, such as internal
5 CYA audit reports and oversight hearings by the California
6 legislature, to support their claims and request for class
7 certification.  (Id. Exhs. E-H).  However, unless plaintiffs
8 establish a personal risk of imminent harm, they may not ask the
9 court to supplant the primary reform and oversight
10 responsibilities of state legislative and executive officials by
11 making generalized complaints of institutional failures at the
12 CYA.  See generally Lewis, 518 U.S. at 349-50.

13 B.   Reliance on Class Allegations to Demonstrate Standing and
     Imminent Harm
14

15    The burden of establishing standing as well as an
16 entitlement to equitable relief lies squarely with the plaintiffs
17 in this case.  See, e.g., San Diego Gun Rights Comm. v. Reno, 98
18 F.3d 1121, 1126 (9th Cir. 1996) ("[a]s the parties invoking
19 federal jurisdiction, plaintiffs bear the burden of establishing
20 their standing to sue . . . [b]ecause plaintiffs seek declaratory
21 and injunctive relief only, there is a further requirement that
22 they show a very significant possibility of future harm").
23 However, plaintiffs provide the court with minimal factual
24 information concerning each named plaintiff's right to equitable
25 relief.  Nor are many of the claims for classwide equitable
26 relief tightly connected to the present circumstances of the

11

1 | individual named plaintiffs.

2 | The result is an unsettling disparity between the

3 | extraordinary breadth of the plaintiffs' claims, involving eleven

4 | broad areas of alleged constitutional and statutory violations in

5 | eleven different CYA correctional facilities, and the amount of

6 | information which the plaintiffs have submitted concerning the

7 | alleged harm faced by the proposed class representatives.

8 | Plaintiffs do not purport to identify at least one named

9 | representative who has suffered the claimed injury at each of the

10 | correctional facilities involved in this suit.  Rather, on an

11 | extreme interpretation of the Ninth Circuit's opinion in

12 | Armstrong v. Davis, 275 F.3d 849 (9th Cir. 2001), plaintiffs are

13 | often content to simply allege one past violation at one CYA

14 | facility and then claim standing and imminent harm based upon a

15 | generalized allegation that the violation is systemwide,

16 | recurring, and similar to other problems that the plaintiffs also

17 | seek to correct.

18 | This is not an adequate showing under Ninth Circuit law.  In

19 | Hodgers-Durgin the court held that standing to seek equitable

20 | relief was not shown where plaintiffs alleged a single violation

21 | and then argued that other members of the class were likely to

22 | sustain future injury:

23 | 
24 | 
25 | 
26 | 

> Unless the named plaintiffs are themselves
> entitled to seek injunctive relief, they may
> not represent a class seeking that relief.
> Any injury unnamed members of this proposed
> class may have suffered is simply irrelevant
> to the question whether the named plaintiffs
> are entitled to the injunctive relief they

1    seek.

2 Hodgers-Durgin, 199 F.3d at 1045.   In a different setting, the

3 Armstrong court held that the likelihood of future injury

4 necessary to establish standing to seek injunctive relief could

5 be shown by demonstrating that the alleged harm arises from a

6 specific written policy or from officially sanctioned behavior

7 involving repeated violations.   Armstrong, 275 F.3d at 861.   Even

8 if Armstrong somewhat softens the above quoted language of

9 Hodgers-Durgin, it is at one with Hodgers-Durgin in reiterating

10 that it is the plaintiff's burden to show a credible threat that

11 he or she will be subject to the same or similar violation in the

12 future.   See id.

13    In Armstrong plaintiffs provided "overwhelming" evidence of

14 repeated violations to themselves and other class members over a

15 long period of time.   Id at 864.   By contrast, in this case, as

16 to the majority of their claims, plaintiffs fall far short of

17 providing even minimally adequate evidence of repeated violations

18 to themselves or to other wards.   Indeed, plaintiffs often fail

19 to allege a single past violation of the particular

20 constitutional or statutory standard that they seek to assert.

21    Moreover, plaintiffs make an inadequate showing that future

22 injury is probable because of the CYA's written or unwritten

23 policies and practices.   In the class portion of their complaint,

24 plaintiffs list over fifty different CYA policies and practices

25 that they allege are deficient.   However, with few exceptions,

26 the named plaintiffs fail to link their injuries to any

13

particular policies or practices or allege that they will be

directly affected by these policies or practices in the future.

Compare Armstrong, 275 F.3d at 861 (allegations of class-wide

discrimination were relevant to the named plaintiffs' risk of

future harm, where named plaintiffs were all disabled prisoners,

sentenced to life in prison without the possibility of parole,

who challenged the state's failure to provide adequate

accommodations at statutorily mandated parole hearings).

Further, beyond bold assertion, plaintiffs do little to

substantiate their claims that they are subject to

unconstitutional practices and policies.[9]

In the absence of specific factual allegations connecting

the named plaintiffs' individual claims to particular CYA

policies and procedures, the complaint's class allegations

provide no additional insight into whether the named plaintiffs

face a sufficient individual likelihood of future injury to

pursue equitable relief.  See Haase v. Sessions, 835 F.2d 902,

911 (D.C. Cir. 1987)("more than a nebulous assertion of the

existence of a 'policy' is required to establish standing;" the

---

[9] Although more detailed allegations by the named plaintiffs
are contained in the Harper Letter, these allegations are not
tied to specific on-going CYA policies or procedures.  (Parks
Decl. Exh. I).  Plaintiffs also rely on legislative testimony
concerning institutional problems at the CYA. (Id. Exh. H).
However, this testimony is focused on broad institutional
concerns, such as the lack of adequate funding or strong
leadership.  The testimony does not help identify specific CYA
policies and practices that can be linked to the named
plaintiffs' asserted injuries.  Nor does the testimony address
the specific CYA facilities at which many of the named plaintiffs
are currently incarcerated.

1  plaintiff must also show that he will be subjected to the policy
2  again and that the threat of repetition is "sufficiently real and
3  immediate" to justify equitable relief).

4  C.   Defendants' Challenges to Standing

5       Although their arguments are not entirely clear, defendants
6  appear to challenge the standing of the named plaintiffs on a
7  number of different grounds, only the first of which is a true
8  standing argument.  First, defendants dispute the named
9  plaintiffs' individual standing to challenge the numerous CYA
10 policies and practices listed in the class portion of the amended
11 complaint.[10]  Defendants correctly argue that because plaintiffs
12 "must demonstrate standing separately for each form of relief
13 sought," the named plaintiffs must establish imminent injury
14 traceable to each separate CYA practice that they seek to enjoin.
15 Friends of the Earth, Inc. v. Laidlaw Environmental Services,
16 Inc., 528 U.S. 167, 185 (2000); see also Lewis, 518 U.S. at 358
17 n.6 ("standing is not dispensed in gross" and is limited to the
18 injury shown; a plaintiff who is injured by one administrative
19 deficiency does not therefore obtain standing to challenge all
20 similar deficiencies).

21      Second, defendants appear to contend that the plaintiffs'
22 broad class definition should be limited, perhaps through
23 subclasses, so that each facility would define a separate class
24

25      [10] The amended complaint does not identify which plaintiffs
26 assert standing to seek injunctive relief as to the numerous
   class claims.  The motion for class certification does little to
   clarify the situation.

1  of wards.   However, this is a question of defining the
2  appropriate class for each of the plaintiffs' claims and applying
3  the typicality and commonality criteria of Fed. R. Civ. P. 23(a),
4  inquiries distinguishable from the foundational question of
5  standing.   Finally, defendants make arguments about the
6  appropriate scope of equitable relief in terms of standing.
7  Again, however, the scope of available relief in the event that
8  plaintiffs prevail on their class claims must be analyzed
9  separately from jurisdictional questions relating to the named
10  plaintiffs' standing and entitlement to equitable relief.   See
11  Armstrong, 275 F.3d at 881-82 (Berzon J., concurring).

12  D.   Conclusion

13       The plaintiffs in this case seek to certify a Rule 23(b)(2)
14  class as a vehicle for obtaining wholesale institutional reform
15  of the CYA.   In opposition to defendants' motion to dismiss on
16  jurisdictional grounds, plaintiffs repeatedly argue that
17  defendants have ignored the class nature of this lawsuit and
18  their status as potential class representatives.   However, the
19  class allegations in this case do not alter the relevant
20  analysis.   Because it is not the court's role to generally "shape
21  the [CYA] so that it compl[ies] with [federal] law and the
22  Constitution," even in response to a class complaint, it is
23  incumbent upon plaintiffs individually to make a sufficiently
24  particularized showing of imminent and irreparable harm to
25  warrant injunctive relief.   Lewis, 518 U.S. at 349.   Such a
26  showing may put pressure on plaintiffs to narrow the breadth of

16

1  this lawsuit, but that is precisely the reason why the imminent
2  injury requirement exists -- to ensure that courts address
3  concrete legal disputes and refrain from entertaining generalized
4  complaints of institutional mismanagement.  See generally Allen
5  v. Wright, 468 U.S. 737, 760 (1984).

6  IV.  Specific Challenges to Standing and the Named Plaintiffs'
7       Entitlement to Injunctive Relief

8  Defendants move to dismiss the claims of Angel Martinez,
9  Raymon Davis, Jermaine Brown, Chris Stevens, and Arlon Carroll,
10 arguing that these plaintiffs fail to establish standing or a
11 sufficient likelihood of imminent injury to warrant equitable
12 relief.  Defendants also move for summary judgment on the claims
13 of Amy Stephens for lack of standing.[11]

14 A.  Defendants' Motion to Dismiss

15 On a motion to dismiss for lack of standing, or failure to
16 meet the imminent and irreparable injury requirement for seeking
17 injunctive relief, "the trial court must accept as true all
18 material allegations of the complaint, and must construe the
19 complaint in favor of the complaining party."[12]   Warth, 422 U.S.

20 _____

21 [11] For the purposes of this order, the court has only
   addressed the specific standing challenges raised by the
22 defendants.  However, the court may choose to revisit the
   plaintiffs' standing as the litigation progresses.  See, e.g.,
23 Warth v. Seldin, 422 U.S. 490, 501 (1975).

24 [12] Defendants have moved to dismiss plaintiffs' claims under
   Rule 12(b)(6), but the proper vehicle for contesting a court's
25 subject matter jurisdiction, including the plaintiff's lack of
   standing, is Rule 12(b)(1).  See White v. Lee, 227 F.3d 1214,
26 1242 (9th Cir. 2000).  Because defendants' motion to dismiss
   largely challenges the sufficiency of plaintiffs' allegations of
   future injury rather than the accuracy of those allegations, the

1  at 501.  Although this standard is lenient, the court is not
2  obliged to accept allegations of future injury which are overly
3  generalized, conclusory, or speculative.  See Schmier v. United
4  States Court of Appeals for the Ninth Circuit, 279 F.3d 817, 820-
5  21 (9th Cir. 2002); United States v. AVX Corp., 962 F.2d 108, 115
6  (1st Cir. 1992).  To establish jurisdiction, the plaintiff must
7  clearly allege specific facts establishing an imminent risk of
8  substantial and irreparable harm.  See Whitmore v. Arkansas, 495
9  U.S. 149, 155 (1990); FW/PBS, Inc. v. City of Dallas, 493 U.S.
10 215, 231 (1990).  In the absence of such specific factual
11 allegations, the court may not assume that jurisdiction exists by
12 "embellishing otherwise deficient allegations of standing."
13 Whitmore, 495 U.S. at 156; see also Western Mining Council v.
14 Watt, 643 F.2d 618, 624 (9th Cir. 1981)("[t]he liberal reading
15 accorded complaints on 12(b)(6) motions is [still] . . . subject
16 to the requirement that the facts demonstrating standing must be
17 clearly alleged in the complaint.  We cannot construe the
18 complaint so liberally as to extend our jurisdiction beyond its
19 constitutional limits.") (citations omitted).

21     (1)  Angel Martinez

23 relevant standards of review under Rule 12(b)(6) and 12(b)(1) are
24 not materially different.  See Adams v. Bain, 697 F.2d 1213, 1219
   (4th Cir. 1982) (where a defendant contends that the complaint
25 "simply fails to allege facts upon which subject matter
   jurisdiction can be based" the court must assume that all facts
26 alleged in the complaint are true; thus, "the plaintiff, in
   effect, is afforded the same procedural protection" under Rule
   12(b)(1) as he would receive on a 12(b)(6) motion).

18

1    Angel Martinez ("Martinez") claims that the CYA failed to
2   reasonably protect his safety by housing him with another ward
3   who had previously attempted to rape him seven years earlier.
4   (SAC at ¶ 18).  Martinez contends that he was housed with this
5   ward in the San Joaquin Hall at Chaderjian from June to August
6   2001 and that the ward again threatened him with physical harm in
7   June 2001.  (Id.)  Although Martinez allegedly informed CYA hall
8   staff about the situation, they failed to separate the wards.
9   (Id.)  Martinez does not allege that he was subject to an actual
10  or attempted assault, nor does he allege that he has suffered any
11  physical injury.

12   For reasons not disclosed in the complaint, the other ward
13  was eventually moved from Chaderjian.  Martinez does not contend
14  that he is presently housed with any other dangerous wards.
15  (Id.)  Nor does Martinez state that he has any particular reason
16  to currently fear for his safety.  In the absence of any
17  allegations suggesting that Martinez continues to face a risk of
18  future assaults, the court cannot conclude that Martinez has
19  asserted a sufficient likelihood of future injury to establish
20  Article III standing.

21   Martinez's allegations also fail to establish a real and
22  immediate threat of irreparable harm, a necessary basis for
23  injunctive relief.  Plaintiffs correctly note that Martinez need
24  not assert that he has actually been attacked in order to seek
25  equitable relief on his failure to protect claim.  See Farmer v.
26  Brennan, 511 U.S. 825, 845-46 (1994).  However, it is not

19

1 Martinez's failure to allege actual physical injury, but rather
2 his failure to make any showing that he is facing an imminent
3 likelihood of physical danger which undermines his standing to
4 seek prospective relief.  Martinez's claim for injunctive relief
5 and declaratory relief on his failure to protect claim is
6 therefore dismissed.

7     (2)   <u>Raymon Davis</u>

8     Raymon Davis ("Davis") asserts that he was subjected to
9 excessive force on January 22, 2001 when a CYA staff member
10 allegedly shot him directly in the head, at close range, with a
11 foam baton gun, causing Davis to lose consciousness.  (SAC at
12 ¶12).  At the time, Davis was involved in a fist fight with other
13 wards, but he contends that the use of the gun was malicious and
14 unnecessary either to stop the fight or to prevent injury.[13]
15 (<u>Id.</u>)  Davis further asserts that CYA staff members frequently
16 misuse the baton gun, violating both the gun manufacturer's
17 recommendations as well as the CYA's own policies that prohibit
18 the firing of the baton gun at the heads of wards.  (<u>Id.</u>)

19     While Davis's allegations are certainly sufficient to
20 support a claim for damages and perhaps Article III standing,
21 they do not establish his right to equitable relief.  Davis does
22 not allege that CYA staff members used the baton gun under a
23 written policy.  Indeed, quite the reverse, he claims that staff
24 members, confronting ward disturbances, use the gun improperly in

25

26

    [13] It is unclear from Davis's allegations who initiated the
fist fight.

20

1 violation of CYA policy.  Thus, any risk of similar future injury

2 that Davis faces is contingent not only on his involvement in

3 another incident prompting use of the baton gun, but also on a

4 CYA staff member's future decision to shoot him in violation of

5 CYA policy.[14]  This chain of events is far too speculative to

6 warrant equitable relief.  See Lyons, 461 U.S. at 111-12;

7 Hodgers-Durgin, 199 F.3d at 1044.  Davis's allegations fail to

8 demonstrate that he faces a real and immediate danger of harm

9 from the misuse of a baton gun sufficient to warrant injunctive

10 relief.  His excessive force claim is therefore dismissed.

11     (3)  Jermaine Brown

12     Jermaine Brown ("Brown") alleges that he was subjected to

13 inhumane living conditions in solitary confinement at the Preston

14 Youth Correctional Facility ("Preston") from December 2000 to

15 July 2001.  (SAC at ¶ 7).  Brown asserts that he was housed in a

16 filthy cell which lacked a functional toilet in the dungeon-like

17 basement of the Tarmarack Lodge at Preston.  (Id.)  The cell's

18 walls were allegedly splattered with dried blood and feces from

19 prior occupants.  (Id.)  During this period, Brown also claims

20 that he was: (1) unable to perform any meaningful exercise, (2)

21 prohibited from attending school, (3) denied access to

22 television, radio, or newspapers, and (4) permitted to make only

23 one telephone call per month.  (Id.)  Finally, Brown contends

24 that he is mentally ill, but received little or no mental health

25

26     [14] Davis makes no other allegations relating to excessive
force in the amended complaint.  He does not contend that he
faces a threat from any other use of force.

treatment while in solitary confinement.  (Id.)

However, Brown is no longer housed at Preston, and he does not allege that his current living conditions at Nelles are inadequate in any way or that he is being deprived of any necessary services.  (Id.)  Although the plaintiffs generally allege as part of their class claims that the "CYA system is plagued with inadequate physical facilities [and that many] . . . cells are filthy, particularly rooms in lockup units," and further assert and that the activities of wards in lockup are severely restricted, Brown makes no specific allegations about the lockup facilities at Nelles or the likelihood that he will again be placed in disciplinary housing.[15]  (Id. at ¶¶ 43, 50). In the absence of any specific allegations demonstrating a continued risk of imminent harm, Brown has not met the requirements for equitable relief on either his physical facilities or lockup claims.  These claims are dismissed.

    (4)  Chris Stevens and Arlon Carroll

Chris Stevens ("Stevens") and Arlon Carroll ("Carroll") both bring mental health care and rehabilitative treatment claims. (Id. at ¶¶ 5,10).  Although defendants do not challenge their ability to pursue injunctive relief on their involuntary medication claims, defendants contend that Stevens and Carroll lack standing to bring broader treatment claims.  (Defs.' Motion to Dismiss at 29-30).

---

[15] The court "must [also] assume that [Brown] will abide by prison rules and thereby avoid a return to segregation status." Knox v. McGinnis, 998 F.2d 1405, 1413 (7th Cir. 1993).

22

1   Carroll alleges that he is housed in Mojave Hall, a unit for

2 sex offenders at Chaderjian.  (SAC at ¶ 10).  He contends that he

3 has repeatedly requested mental health treatment, but has only

4 been provided with counseling sessions led by college students

5 and with access to unproductive communal meetings with large

6 groups of disruptive wards.  (Id.)  Carroll specifically alleges

7 that the "Mojave Hall program, like other CYA sex offender

8 treatment programs, has little or no clinical staff involvement,

9 no training budget, and erratic results."  (Id.)  Carroll's

10 allegations indicate that he is presently housed in a unit with

11 inadequate treatment programs, supporting the reasonable

12 inference that he will continue to be denied the treatment which

13 he seeks.  Notably, Carroll, unlike many of the other named

14 plaintiffs, specifically links his past injury and request for

15 prospective relief to a particular CYA practice that directly

16 affects him and continues to threaten him with future harm.

17 Because Carroll's allegations establish that he faces a

18 particularized risk of immediate harm, he has standing to pursue

19 his treatment claims and has satisfied the imminent injury

20 requirement for seeking injunctive relief.

21   By contrast, Steven's allegations are vague and indefinite

22 and do not indicate that Stevens faces any risk of future harm.

23 Stevens simply contends that he is mentally ill and has been

24 diagnosed by the CYA as suffering from "psychotic disorders and

25 depression."  (Id. at ¶ 5).  Stevens also alleges that he has

26

1 attempted suicide several times.[16]   (Id.)   However, Stevens does

2 not allege that he has been denied necessary mental health

3 treatment by the CYA or that the CYA has ignored his mental

4 health needs.   In the absence of any specific allegations of

5 either past or future injury, Stevens lacks standing to pursue

6 equitable relief on his mental health care claims, and his claims

7 are therefore dismissed.

8  B.   <u>Motion for Summary Judgment on Amy Stephen's Denial of
      Medical Care Claim</u>

9

10     Amy Stephens ("Stephens") alleges that she suffered from

11 untreated tonsillitis for over eighteen months while in the CYA's

12 custody.   (Id. at ¶ 24).   She contends that CYA officials refused

13 to authorize a tonsillectomy although the operation had been

14 recommended by two specialists.   (Id.)   Stephens's tonsils were

15 not removed until February 1, 2002, after the plaintiffs' amended

16 complaint had been lodged with the court.   (Defs.' SUF at ¶ 7).

17 Defendants argue that the February operation mooted Stephens's

18 request for prospective relief and that they are therefore

19 entitled to summary judgment on her denial of medical care claim.

20     When a plaintiff has standing at the commencement of an

21 action, the defendant's voluntary cessation of the challenged

22 conduct does not serve to automatically deprive the court of

23 jurisdiction by mooting the controversy.   Laidlaw, 528 U.S. at

24 189 (explaining that such a rule would improperly permit

25 ─────────────────

26     [16] It is unclear, however, from the complaint whether these
     prior suicide attempts took place while Stevens was in CYA
     custody.

1  defendants to evade judicial review).  Because of the risk that

2  defendants will resume their old practices in the future, the

3  standard for demonstrating mootness is accordingly strict, and

4  defendants bear the heavy burden of persuading the court that

5  there is no reasonable expectation that their allegedly wrongful

6  behavior will reoccur in the future.  See id.  The defendants in

7  this case have met this burden with regard to Stephens's medical

8  treatment claim because her tonsils have now been treated and

9  actually removed.  Thus, there is no possibility that she will

10  continue to suffer from tonsillitis.

11      Plaintiffs argue, however, that Stephens may suffer from

12  similar delays in receiving other necessary medical treatment in

13  the future so long as she remains in the CYA's custody.  However,

14  Stephens's allegations focus exclusively on the CYA's failure to

15  treat her tonsillitis.  Not only does she fail to allege that she

16  has been denied any other medical treatment, but she has also

17  failed to come forward with specific facts, in response to

18  defendants' motion for summary judgment, which demonstrate that

19  she will need additional medical care from CYA in the future.[17]

20  See Lujan, 504 U.S. at 561 (a plaintiff may no longer rest on

21  general allegations in response to a motion for summary judgment,

22

23 ───────────────

    [17] Stephens argues that she cannot provide specific
24  information about her current medical needs, because the CYA has
    not produced copies of her medical files.  (Pls.' Opp. at 24-25).
25  However, Stephens could have submitted a declaration describing
    her current medical condition even without access to the files.
26  To the extent that Stephens merely hopes that her CYA files may
    reveal further medical problems, such speculation is insufficient
    to establish standing.

1  and must come forward with specific facts demonstrating a
2  likelihood of future injury).   Thus, Stephens has failed to
3  demonstrate even the credible threat of future injury necessary
4  to establish Article III standing to bring broader medical care
5  claims, let alone the type of imminent and substantial risk of
6  future harm required to pursue equitable relief with regard to
7  the CYA's medical treatment policies.

8      The presumption of future injury that applies when a
9  defendant voluntarily ceases its conduct is not "a substitute for
10 the allegation of present or threatened injury upon which initial
11 standing must be based."   Steel Co. v. Citizens for a Better
12 Environment, 523 U.S. 83, 109 (1998)(noting that such a rule
13 would negate "clear precedent requiring that the allegations of
14 future injury be particular and concrete").   Therefore, as
15 Stephens lacks standing to generally challenge the CYA's medical
16 treatment policies, and as she has already received the only
17 medical treatment that she had standing to seek, her claim for
18 injunctive relief must be dismissed as moot.

19 C.   Conclusion

20     Plaintiffs have the burden on standing, and they did not
21 carry it.   Notably, the amended complaint fails to make a single
22 allegation directly addressing the question of future injury
23 despite the plaintiffs' request for sweeping injunctive relief
24 against the CYA.   Plaintiffs cannot have it both ways by making
25 broad allegations of institutional failure, yet providing class
26 representatives who have suffered discrete and isolated incidents

1  of harm.   If the problems at CYA correctional facilities are
2  pervasive, as plaintiffs claim, then individual plaintiffs who
3  have experienced repeated violations are the appropriate
4  representatives to seek injunctive relief on behalf of a class.

5      For the reasons stated above, Martinez's failure to protect
6  claim, Davis's excessive force claim, Brown's physical facilities
7  and lockup claims, Stevens's mental health care claim, and
8  Stephens's denial of medical care claim are dismissed.   Stephens,
9  Brown, Martinez, and Davis are the only proposed class
10  representatives who allege that they have been denied necessary
11  medical care, exposed to excessive force, housed in inadequate
12  physical facilities, or subjected to unconstitutional conditions
13  in lockup units. Plaintiffs therefore fail to establish a right
14  to injunctive relief on their medical treatment, excessive force,
15  physical facility, and lockup claims, four of the eleven broad
16  areas in which they seek class certification.

17              V. Motion to Dismiss on Substantive Grounds

18      Defendants have also moved to dismiss the following named
19  plaintiffs' claims for failure to state a claim: (1) the verbal
20  abuse claims of Khalil Jindherd, (2) the disability
21  discrimination claims of Darren Striplin and Arlon Carroll, (3)
22  the education and rehabilitative treatment claims of Arlon
23  Carroll and David Owens, and (4) the legal mail claims of Chris
24  Stevens, Jermaine Brown, and Angel Martinez.

25

26

1   A.    Appropriate Constitutional Standard

2        Neither the Supreme Court nor the Ninth Circuit has decided
3   which constitutional standard should apply to the claims of
4   juveniles incarcerated for penal as well as rehabilitative
5   purposes.  See Ingraham v. Wright, 430 U.S. 651, 669 (1977)
6   (noting that "[s]ome punishments, though not labeled 'criminal'
7   by the State, may be sufficiently analogous to criminal
8   punishments in the circumstances in which they are administered
9   to justify application of the Eighth Amendment," but declining to
10  decide if plaintiffs involuntarily confined at "juvenile
11  institutions can claim the protection of the Eighth Amendment");
12  Gary H. v. Hegstrom, 831 F.2d 1430, 1432 (9th Cir. 1987)
13  (analyzing the constitutional claims of wards incarcerated at a
14  Oregon juvenile facility under the Fourteenth Amendment where
15  wards had not been convicted of a crime and their confinement was
16  solely for noncriminal and nonpenal purposes).  Because the
17  parties agree that the plaintiffs claims' are properly analyzed
18  under the Fourteenth Amendment and have not fully briefed how the
19  specific statutory purpose and mission of the CYA should inform
20  the choice of constitutional standards, the court will assume for
21  the purposes of this order that "the more protective fourteenth
22  amendment standard" applies to the named plaintiffs' claims.[18]

23

24        [18] Although the CYA has a rehabilitative purpose, California
25  law also provides that juveniles may receive "punishment that is
    consistent with the rehabilitative goals" of the juvenile justice
26  system through commitment to the CYA.  See Cal. Welf. & Inst.
    Code §§ 202(d)-(e), 1700.

28

1  See Gary H., 831 F.2d at 1432.

2      It is clear, however, that the Fourteenth Amendment no

3  longer applies after a plaintiff's criminal conviction.  See

4  Graham v. Connor, 490 U.S. 386, 393, 393 n.6 (1989)(Eighth

5  Amendment applies after "conviction and sentence"); Resnick v.

6  Hayes, 213 F.3d 443, 448 (9th Cir. 2000)(after conviction Eighth

7  Amendment applies to prisoners' claims).  Because two of the

8  named plaintiffs, Stevens and Jindherd, have been convicted of a

9  crime as adults and sentenced to the CYA, their claims must be

10  analyzed under the Eighth Amendment.

11  B.  Verbal Abuse

12      Khalil Jindherd ("Jindherd") is a deaf ward who is currently

13  incarcerated at Chaderjian.  (SAC at ¶ 14).  He alleges that CYA

14  staff members "make fun of him, swear at him, and treat him

15  disrespectfully because of his disability."  (Id.)  "[V]erbal

16  harassment generally does not violate the Eighth Amendment."

17  Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996).  Because

18  allegations of verbal abuse alone do not state a cognizable

19  constitutional claim, Jindherd's verbal abuse claim must be

20  dismissed.  See Freeman v. Arpaio, 125 F.3d 732, 738 (9th Cir.

21  1997); Buckley v. Gomez, 36 F. Supp.2d 1216, 1221-22 (S.D. Cal.

22  1997).

23  C.  Disability Discrimination

24      Arlon Carroll ("Carroll") and Darren Striplin ("Striplin")

25  both allege that they are qualified persons with disabilities.

26  (SAC at ¶¶ 11, 25).  Carroll asserts that as a result of "the

1  CYA's failure to make reasonable modifications to [its] policies
2  and procedures, particularly in its education department," he has
3  been denied "meaningful access to CYA programs, services, and
4  activities."  (Id. at ¶ 11).  Striplin also contends that he has
5  been denied meaningful access to CYA programs and services.  (SAC
6  at ¶ 25).  The amended complaint provides no further details
7  about the individual disabilities of Carroll and Stiplin or the
8  nature of the programs and services that they wish to gain access
9  to.

10      Title II of the ADA prohibits public entities from
11  discriminating on the basis of disability.  See 42 U.S.C. §
12  12132, Thompson v. Davis, 282 F.3d 780, 783 (9th Cir. 2002).  To
13  state a claim under Title II, a plaintiff must allege that: (1)
14  he is a qualified person with a disability, (2) otherwise
15  entitled to participate in or receive the benefits of a public
16  program or service, (3) who was excluded, (4) solely by reason of
17  his disability.  See Thompson, 282 F.3d at 783.  Similar
18  requirements apply under § 504 of the Rehabilitation Act which
19  applies to programs receiving federal financial assistance.  See
20  42 U.S.C. § 794(a).  To establish a violation of § 504, a
21  plaintiff must demonstrate that: "(1) he is an 'individual with a
22  disability,'(2) he is 'otherwise qualified' to receive the
23  benefit, (3) he was denied the benefits of the program solely by
24  reason of his disability  and (4) the program receives federal
25  financial assistance."  Weinreich v. Los Angeles County Metro.
26  Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).

1    Defendants argue that Striplin and Carroll's ADA and
2 Rehabilitation Act claims should be dismissed because the
3 complaint contains no allegations clearly indicating that
4 Striplin and Brown were excluded from CYA programs "solely" on
5 the basis of their disability.[19]  The vagueness of the complaint
6 does make it difficult to understand the scope of plaintiffs'
7 claims.  For example, it is unclear how Carroll's specific
8 discrimination claim differs from his general attack on the
9 adequacy of the CYA's special educational programming.  However,
10 despite the vagueness of the complaint, one can fairly infer that
11 Brown and Striplin are claiming that they have been unable to
12 participate in certain CYA programs because of the alleged
13 failure of the CYA to properly accommodate their disabilities,
14 not simply because the CYA fails to provide these programs to all
15 wards.  Thus, Carroll and Striplin have adequately stated ADA and
16 Rehabilitation Act claims, and defendants' motion to dismiss is
17 denied.

18 D.   Education and Rehabilitative Treatment

19    Both Carroll and Owens assert "Education/Programming"
20 claims.  Carroll alleges that he has a learning disability and
21 needs special education classes.  (SAC at ¶ 11).  He asserts that
22 he is now 22 years old but is still 140 credits away from
23 attaining his high school diploma "due to the abject failure of
24

25    [19] Defendants do not challenge Khalil Jindherd's ability to
26 bring ADA and Rehabilitation Act claims based on the CYA's
alleged failure to provide him with access to a sign language
interpreter and a text telephone.

1   the CYA's education system."  (Id.)  Carroll specifically

2   contends that his schooling has been constantly interrupted by

3   high teacher turnover.  (Id.)  During the first seven months of

4   2001, for example, the CYA purportedly failed to provide Carroll

5   with full-time special education classes.  Even his part-time

6   classes were allegedly erratic, and from April through June 2001,

7   Carroll claims he received no formal schooling at all.  (Id.)

8   Carroll also generally alleges that he is confined in a unit for

9   sex offenders but has received inadequate sex offender treatment.

10   (Id.)

11      Owens alleges that he was improperly confined in lockup

12   units at Stark and Chaderjian from September 2000 to January 31,

13   2001 without a hearing to determine the necessity of his

14   confinement in disciplinary housing.  (Id. at ¶ 20).  During this

15   five month period, Owens asserts that he received education in a

16   "cage" and was denied access to certain programs ordered by the

17   Youthful Offender Parole Board.  (Id.)  Owens also claims that he

18   was unable to participate in any educational programs from March

19   13 to October 15, 2001 during a general lockdown at Chaderjian of

20   all "northern Hispanics."  (Id.)  Finally, Owens asserts that he

21   is presently receiving only 1.5 to 2 hours of daily education.

22   (Id.)

23      Although the scope of the plaintiffs' education and

24   programming claims is unclear from the complaint, it appears that

25   plaintiffs contend that the CYA has a constitutional obligation

26   to provide them with general education and rehabilitation (such

1  as substance abuse and sex offender treatment programs) at a
2  minimally adequate level.    Neither the Supreme Court nor the
3  Ninth Circuit has directly addressed the question of whether
4  incarcerated juveniles, as opposed to civilly committed mental
5  patients, have a constitutional right to education and
6  rehabilitative treatment.  See, e.g., L.H. v. Jamieson, 643 F.2d
7  1351, 1356 n.3 (9th Cir. 1981)(noting that the question of
8  whether the Constitution "confers a 'right to treatment' upon the
9  juveniles in the state's custody is a substantial and difficult
10 question"); cf. Youngberg v. Romeo, 457 U.S. 307, 317-19 (1982)
11 (involuntarily committed persons have a constitutional right to
12 minimally adequate treatment and training to ensure safety and
13 freedom from undue restraint); Sharp v. Weston, 233 F.3d 1166,
14 1172 (9th Cir. 2000)(due process clause of Fourteenth Amendment
15 "requires states to provide civilly-committed persons with access
16 to mental health treatment that gives them a realistic
17 opportunity to be cured and released").

18      Other courts that have confronted the question have reached
19 conflicting conclusions as to whether incarcerated juveniles have
20 a constitutional right to education and treatment.  Compare
21 Santana v. Collazo, 714 F.2d 1172, 1176-77 (1st Cir. 1983)
22 (acknowledging that rehabilitative training is desirable, but
23 holding that institutionalized juveniles have no constitutional
24 right to such treatment) and Morales v. Turman, 562 F.2d 993, 998
25 (5th Cir. 1977)(distinguishing between the commitment of the
26 mentally ill and the confinement of juvenile offenders and

33

1    expressing doubts as to whether juveniles offenders have a

2    comparable constitutional right to treatment) <u>with</u> <u>Nelson v.</u>

3    <u>Heyne</u>, 491 F.2d 352, 360 (7th Cir. 1974)(incarcerated juveniles

4    have a constitutional right to treatment which includes the right

5    to individualized care); <u>Alexander S. v. Boyd</u>, 876 F.Supp. 773,

6    790 (D.S.C. 1995)("a minimally adequate level of programming is

7    [constitutionally] required in order to provide juveniles with a

8    reasonable opportunity to accomplish the purpose of their

9    confinement").

10       Given the conflicting caselaw, which has not been fully

11   briefed by the parties, and the likelihood that any evaluation of

12   the plaintiffs' claims will require a fact intensive inquiry into

13   the CYA's education and treatment policies, defendants' motion to

14   dismiss is premature.  The motion to dismiss the plaintiffs'

15   right to treatment and education claims is therefore denied.

16   E.   <u>Interference with Legal Mail and Attorney Client</u>
          <u>Communications</u>
17

18       Three of the named plaintiffs, Stevens, Brown, and Martinez,

19   assert claims based on alleged interference with their legal

20   mail.  Stevens alleges that he was informed on June 12, 2001 that

21   all of his letters marked "legal mail" would be reviewed and that

22   he was threatened with a transfer to another CYA facility after

23   meeting with one of his attorneys.  (SAC at ¶ 6).  Brown claims

24   that a parole officer and a CYA counselor confronted him with a

25   confidential questionnaire sent to him by his attorney in a

26

34

sealed envelope and demanded to know what Brown intended to tell his lawyer about the CYA.[20]   (<u>Id.</u> at ¶ 9).   Finally, Martinez asserts that a CYA staff member threatened him with a disciplinary report if he refused to show her legal mail from counsel in this case.   (<u>Id.</u> at ¶ 19).   Martinez alleges that because of a staff member's threats he signed a statement falsely indicating that he had voluntarily disclosed the mail.   (<u>Id.</u>)

Plaintiffs' allegations can be interpreted as an attempt to state Fourteenth Amendment claims for denial of access to the courts.   <u>See</u>, <u>e.g.</u>, <u>Royse v. Superior Court</u>, 779 F.2d 573 (9th Cir. 1985).   However, an indispensable element of any access to courts claim is actual injury.   <u>See</u> <u>Lewis</u>, 518 U.S. at 351 (plaintiff must show that defendant's conduct "hindered his efforts to pursue a legal claim"), <u>Olive v. Flauvier</u>, 118 F.3d 175, 177-78 (3d Cir. 1997)(to bring an access to courts claim based on interference with legal mail, the plaintiff must show that defendant's alleged interference actually impeded his ability to pursue a legal claim).   Plaintiffs do not allege actual injury.   Were more particularized pleading required, the court would dismiss these claims.   However, the claims are adequately pleaded under the notice pleading standard of Fed. R. Civ. P. 8.   Through discovery, defendants may require plaintiffs to identify the legal proceedings in which plaintiffs allege

---

[20] The envelope allegedly stated: "this is a confidential document containing attorney-client communication."   (SAC at ¶ 9).

1  prejudice due to defendants' actions.  See Fed. R. Civ. P. 11.

2  Defendants' motion to dismiss these claims is denied.

3                  VI. Motion for Class Certification

4       The court will address the plaintiffs' motion for class

5  certification on the plaintiffs' remaining claims which relate

6  to: (1) the physical safety of wards, (2) disability

7  discrimination, (3) interference with attorney-client

8  communications, (4) provision of religious services, (5) the

9  adequacy of mental health care, (6) education and rehabilitative

10 programming, and (7) procedural due process.[21]

11 A.   Rule 23 Requirements

12      Like questions of standing, "class certification must be

13 addressed on a claim-by-claim basis."  James v. City of Dallas,

14 254 F.3d 551, 563 (5th Cir. 2001).  The party seeking class

15 certification bears the burden of demonstrating that all of Rule

16 23's requirements for class certification have been satisfied.

17 See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186

18 (9th Cir. 2001).  To obtain class certification, the plaintiffs

19 must first satisfy the numerosity, commonality, typicality, and

20 adequacy of representation requirements of Rule 23(a).  See

21 Walters v. Reno, 145 F.3d 1032, 1045 (9th Cir. 1998).[22]  "These

22 _____

23      [21] Because the plaintiffs' amended complaint does not
   specify which claims each named plaintiff seeks to assert, either
24 individually or on behalf of the class, the court has attempted
   to match the plaintiffs' individual allegations to the class
25 claims to conduct the required Rule 23 analysis.

26      [22] Under Rule 23(a), plaintiffs must demonstrate that: (1)
   the proposed class: "is too numerous, making joinder of the
   parties impracticable; (2) common questions of law or fact exist

                                36

requirements effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims'" by ensuring that the named plaintiffs have suffered the same injury and possess the same interest as the other class members.  <u>General Telephone Co. v. Falcon</u>, 457 U.S. 147, 156 (1982).  The plaintiffs must then demonstrate that their claims fall under one of the categories listed in Rule 23(b).  Because the plaintiffs seek class certification under Rule 23(b)(2), they must establish that defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).

As the Ninth Circuit has recognized, the commonality and typicality inquiry under Rule 23(a) and the availability of Rule 23(b)(2) class certification frequently overlap when plaintiffs seek class certification based on the existence of a common policy or practice allegedly applicable to the class as a whole.  <u>See</u> <u>Walters</u>, 145 F.3d at 1045-47; <u>Armstrong</u>, 275 F.3d at 868-69.  For example, commonality is satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members," and a named plaintiff's claims can be deemed typical of the class if plaintiff has suffered similar injuries that arise from the "same, injurious course of conduct"

among class members; (3) the claims of the class representatives are typical of the claims that class; and (4) the class representatives will adequately represent the interests of the class."  <u>Walters</u>, 145 F.3d at 1045.

1  by the defendant.   <u>Armstrong</u>, 275 F.3d at 868-69.   In addition,
2  when a class seeks equitable relief to correct a pattern or
3  practice alleged to generally affect all class members,
4  commonality and typicality under Rule 23(a) are not defeated by
5  minor differences in the individual circumstances of class
6  members.   <u>See</u> <u>id.</u>

7      The parties' class certification arguments focus on the
8  sufficiency of plaintiffs' "policy and practice" allegations.
9  While plaintiffs argue that their allegations of systemwide CYA
10 failures are sufficient to support class certification,
11 defendants attack both the breadth and conclusory nature of the
12 plaintiffs' claims.   Defendants assert that plaintiffs have
13 failed to identify specific policies and practices linked to the
14 individual allegations of the proposed class representatives, and
15 that in the absence of such a link, plaintiffs' claims are too
16 broadly defined to demonstrate either commonality or typicality
17 under Rule 23(a).   Defendants also contend that plaintiffs have
18 failed to support their allegations of wide-spread institutional
19 failure with actual evidence suggesting that the alleged policies
20 and practices exist on a systemwide level throughout the CYA's
21 eleven separate correctional facilities and not simply at
22 particular facilities.

23 B.   <u>Standard for Evaluating Class Certification</u>

24     Because "actual, not presumed," compliance with Rule 23
25 remains the touchstone for class certification, a class may be
26 certified only after the court has conducted a "rigorous

analysis" to determine if class certification is appropriate in light of the particular facts underlying the plaintiff's claim. Falcon, 457 U.S. at 160-61.  At the class certification stage, plaintiffs need not prove the merits of their claims.  However, they "must provide more than bare allegations that they satisfy the requirements of Rule 23 for class certification."  Morrison v. Booth, 763 F.2d 1366, 1371 (11th Cir. 1985); see also Szabo v. Bridgeport Machines Inc., 249 F.3d 672, 677 (7th Cir. 2001).  In addition, because "motions for class certification are fact-specific, and therefore, the outcome of these motions will vary based on the specific facts of the case," a careful analysis of class certification issues may not be possible where the plaintiffs' claims are broad and the factual record is undeveloped.  See McReynolds v. Sodexho Marriot Services, Inc., 208 F.R.D. 428, 442 (D.D.C. 2002).  Therefore, the vaguer the plaintiffs' claims, the less likely it is that plaintiffs will succeed in making the necessary showing for class certification under Rule 23.[23]

In this case, plaintiffs controlled the timing of their certification motion by bringing the motion before the factual record could be adequately developed and before their claims had been refined.  But plaintiffs may not obtain class certification based on unsupported allegations of systemwide violations,

---

[23] The court exercises considerable discretion in evaluating requests for class certification, and may accordingly limit the definition of the proposed class based on the strength of the plaintiff's showing.  See Armstrong, 275 F.3d at 872 n.28; Conant v. McCaffrey, 172 F.R.D. 681, 693 (N.D. Cal. 1997).

especially when they rely on such allegations not only to establish commonality and typicality under Rule 23(a) but also to demonstrate the propriety of class certification under Rule 23(b)(2).[24]   Generalized policy and practice allegations do not substitute for the kind of specific legal and factual showings required by Rule 23.   See J.B. v Valdez, 186 F.3d 1280, 1289 (10th Cir. 1999)(refusing to "read an allegation of systematic failures as a moniker for meeting the class action requirements"); cf. Falcon, 457 U.S. at 158 (a general allegation that the defendant has a practice of discriminatory hiring, without supporting factual allegations, is insufficient under Rule 23).

To meet their burden under Rule 23, the plaintiffs must identify the specific CYA policies or practices which they seek to challenge and provide a sufficient factual foundation for their allegations of systemwide harm to support the certification of a systemwide class.   Without such information, the court will be unable to assess whether the policies and practices cited by the plaintiffs apply to the proposed class of CYA wards with sufficient consistency and frequency to merit class treatment under the standards of Rule 23(a) and 23(b)(2).

---

[24]   That the CYA is a centrally run organization with systemwide policies and procedures is not sufficient by itself to justify certification of a systemwide class as the plaintiffs appear to argue.   (Pls.' Reply in Support of Class Cert. at 8-9). The inadequacy of such conclusory assertions is apparent when one considers that some of plaintiffs' claims posit violation of the CYA's written, systemwide policies.

1  C.    Plaintiffs' Submissions

2        Motions for class certification under Rule 23(b)(2) are

3  usually supported by detailed declarations from the named

4  plaintiffs as well as documentary evidence demonstrating the

5  existence of the alleged policy or practice that is challenged.

6  In this case, plaintiffs have not provided any declarations from

7  the proposed class representatives, nor have they yet deposed any

8  CYA administrators.   Instead, plaintiffs rely principally on

9  internal CYA reports and legislative materials that evaluate the

10 operation of individual CYA facilities and the CYA as a whole.

11       Notably, the plaintiffs' own submissions demonstrate the

12 fallacy of regarding the CYA as one uniform entity and highlight

13 the need for the careful analysis of plaintiffs' claims under

14 Rule 23.   (Transcript of Joint Oversight Hearing at 5 (explaining

15 that "[t]he level and quality of programming at the CYA varies

16 widely between institutions"), Parks Decl. Exh. H).   Not only do

17 the CYA's eleven different institutions serve different

18 populations of wards but each institution also offers different

19 programs and housing units.   (Id. Exh. D).   For example, Stark

20 houses "the most dangerous youthful offenders in the California

21 Youth Authority's custody," many of whom are serving lengthy

22 sentences for violent crimes and all of whom are over eighteen

23 years old.  (Id. Exh. E at 6).   Similarly, the Tamarack Lodge at

24 Preston, where Brown was previously confined, is a Special

25 Management Program ("SMP") unit for wards with a history of

26 assaultive or disruptive behavior.   (Id. Exh. I at 17).

1    The plaintiffs' submissions also indicate that the CYA has
2 different policies and procedures which govern the treatment of
3 wards within each of the broad areas in which plaintiffs seek
4 class certification.  For example, within the category of
5 "education and rehabilitation," are programs as diverse as GED
6 preparation, vocational training, post-secondary education,
7 substance abuse treatment, and special education classes.  And
8 encompassed within the term "mental health care" are different
9 procedures governing intensive treatment for emotionally
10 disturbed offenders, the treatment of sex-offenders, suicide
11 watch practices, the medication of wards, and mental health
12 assessments for wards in the general population.  (Id. Exhs. C-D,
13 I, N).  Because the plaintiffs have chosen to bring such an
14 expansive class action, their burden on a motion for class
15 certification is substantial.  Consequently, where either the
16 plaintiffs' allegations or the record is unclear, certification
17 will be denied.

18 D.   Certification of Class Claims

19      (1)  Physical Safety of Wards

20    Stevens is the only named plaintiff with standing to assert
21 a physical safety claim.  However, as Stevens is confined to the
22 CYA on the basis of a criminal conviction, his failure to protect
23 claim must be analyzed under the Eighth Amendment, and he may not
24 represent a broader class of CYA wards asserting Fourteenth
25 Amendment claims.  See Hawkins v. Comparet-Cassani, 251 F.3d
26 1230, 1238 (9th Cir. 2001)("As a convicted prisoner, [the named

42

1  plaintiff] . . . cannot represent a class [containing pretrial

2  detainees] alleging constitutional claims that [he] does not have

3  standing to raise . . . These claims can be maintained in a

4  [single] class action only by certifying subclasses with

5  appropriate representation."); <u>Wooden v. Board of Regents of the</u>

6  <u>University of Georgia</u>, 247 F.3d 1262, 1288 (11th Cir. 2001)("a

7  plaintiff cannot represent a class unless he has standing to

8  raise the claims of the class he seeks to represent").  Moreover,

9  there is an inadequate showing that the CYA has a pattern or

10 practice of failing to protect wards at all of its facilities.

11 Class certification on plaintiffs' physical safety claim is

12 therefore denied.

13      (2)  <u>Disability Discrimination</u>

14      Three named plaintiffs, Carroll, Striplin, and Jindherd

15 state claims under the ADA and the Rehabilitation Act.  Jindherd

16 alleges that he is deaf and that the CYA has failed to provide

17 him with sign language interpretation services and access to a

18 text telephone. (SAC at ¶¶ 14-15).  Carroll and Striplin also

19 allege that they are disabled and that they have been denied

20 meaningful access to CYA programs, services, and activities.

21 (<u>Id.</u> at ¶¶ 11, 25).  However, Carroll and Striplin provide no

22 more information about either the nature of their disabilities or

23 the types of alleged discrimination which they challenge.

24      In the absence of such allegations it is impossible to

25 determine what practices Carroll and Striplin have standing to

26 attack, let alone if they can properly represent a class

43

asserting disability discrimination in such diverse areas as education, special education, exercise, counseling, physical accommodations, and ADA grievance procedures.  (Id. at ¶¶ 84-88). As the Ninth Circuit has recognized, both the character of the named plaintiff's particular disability as well the nature of the program he or she wishes to participate in, are critical to the typicality and commonality analysis under Rule 23(a).  See Armstrong, 275 F.3d at 869 (class certification was defective where class included prisoners with renal disorders, sexually violent prisoners, and mentally disordered prisoners, yet no named plaintiffs fell into these categories, and it was unclear if the hearing processes for sexually violent and mentally disordered prisoners were sufficiently similar to be included in the same lawsuit).

Moreover, while Jindherd's allegations are sufficiently detailed to permit certification of a more narrowly defined class of hearing impaired wards, there is no evidence in the record that the CYA has a pattern or practice of denying hearing impaired wards access to necessary services or otherwise discriminating against such wards.  Indeed, Jindherd is the only ward who raises any allegations of discrimination related to a hearing disability.  Cf. Falcon, 457 U.S. at 159 ("one allegation of specific discriminatory treatment" is not sufficient to "support an across-the-board attack" on a company's employment practices).  Because the plaintiffs' have failed to satisfy the requirements of Rule 23, the court declines to certify a class of

1  wards to pursue ADA and Rehabilitation Act claims.

2       (3)   <u>Interference with Attorney-Client Communications</u>

3       Class certification must also be denied on plaintiffs'

4  interference with attorney-client communications claim for

5  similar reasons.  Although Stevens, Brown, and Martinez allege

6  that CYA staff members inappropriately read or threatened to read

7  their confidential legal mail, plaintiffs provide no evidence of

8  a pattern or practice of similar acts that would justify class

9  certification under Rule 23(b)(2).  (SAC at ¶¶ 6, 9, 19).  Only

10  one other ward asserts that he was harassed for receiving legal

11  mail and that his mail was improperly confiscated during a room

12  search.  (Parks Decl. Exh. I at 53).  Four instances of

13  interference with legal mail are insufficient to support the

14  existence of a systematic policy or practice.  Moreover, there is

15  no showing by any putative class representative that his or her

16  access to the courts was affected by the alleged interference, a

17  necessary element of any court access claim.  Therefore, the

18  court cannot find that the proposed representatives can

19  adequately represent a class of wards whose access to court was

20  impeded.  Class certification is accordingly denied.

21       (4)   <u>Religious Services</u>

22       Davis alleges that he was denied access to "any religious

23  services" while on lockdown for approximately ninety days at

24  Stark.  (SAC at ¶ 13).  The CYA's current Restricted Programs

25  Policy provides that wards on lockdown "shall have weekly access

26

1  to religious counsel/services."[25]   (Restricted Programs Policy,

2  Silva Decl. Exh. A at 4).   Although wards in lockdown may be

3  prohibited from "attend[ing] church services due to safety and

4  security issues," such wards are supposed to receive "one-to-one

5  religious services" through weekly chaplain visits upon request.

6  (Harper Letter, Parks Decl. Exh. I at 79; Restricted Programs

7  Policy, Silva Decl. Exh. A at 11, I&C Manual § 6340, Parks Decl.

8  Exh. 0).   This policy is systemwide and reduced to writing.

9  However, Davis does not challenge this policy; rather, he asserts

10 that he was denied access to "any" religious services while on

11 lockdown at Stark.   (SAC at ¶ 13).

12     Plaintiffs have not made an adequate showing that the CYA's

13 restricted program religious services policy is routinely

14 violated at Stark or at any other correctional facility.

15 Isolated examples of deviations from a systemwide policy do not

16 support class certification.   Since plaintiffs apparently do not

17 challenge the systemwide policy, but only its violation, and do

18 not show widespread violations, plaintiffs fail to satisfy the

19 prerequisites for class certification.

20     (5)  Mental Health Care

21     The plaintiffs' mental health care claims can be divided

22 into three separate categories: (1) involuntary medication of

23 ────────────────

24     [25] A "Restricted Program" is defined as "a temporary
   condition that provides a more secure environment for any ward(s)
25 for the purpose of ensuring the safety and security of the
   individual or the institution" and includes administrative
26 lockdown, temporary detention, SMP, and disciplinary program
   restrictions.   (Restricted Programs Policy, Silva Decl. Exh. A at
   1).

1  wards, (2) provision of treatment to sex-offenders, and (3)
2  provision of general mental health care to wards.  For the
3  reasons discussed below, class certification will be limited to
4  the first two categories.

5          i.   Involuntary Medication

6      Brown and Striplin both allege that they were improperly
7  forced to take psychotropic medication while in CYA custody. (SAC
8  at ¶¶ 8, 25).  Striplin asserts that he was involuntarily
9  medicated with Haldol and Thorazine in 2001 without a hearing.
10 (Id. at ¶ 25).  Brown contends that he was coerced into taking
11 psychotropic medication by threats of prolonged solitary
12 confinement and that he was administered psychotropic medication
13 without appropriate review by clinical staff.  Brown also alleges
14 that CYA staff members failed to obtain the consent of a parent
15 or guardian before administering the drugs. (Id. at ¶ 8).

16     According to CYA policy, wards may be involuntarily
17 medicated to control behavior related to their psychiatric
18 diagnosis.  (I&C Manual §§ 6282-84, Templeton Decl. Exh. A at
19 24).  A hearing is not required before forced medication if the
20 ward is either: (1) gravely disabled and incompetent to refuse
21 medication or (2) deemed a danger to himself or others.  (Id. at
22 § 6282).  The CYA requires a hearing only if the ward is
23 involuntarily medicated for more then 72 hours.  (Id. at § 6284).

24     It is not entirely clear whether plaintiffs attack the CYA's
25 involuntary medication policy or the CYA's alleged failure to
26 implement the policy.  The validity of the involuntary medication

47

1 policy raises a common legal question which will not depend on
2 individual factual differences, and because this common policy is
3 applicable to all CYA wards, class certification under Rule
4 23(b)(2) is appropriate.  The court therefore certifies a class
5 of all CYA wards who have been forcibly medicated with a
6 psychotropic drug during the past year without an initial hearing
7 under I&C Manual §§ 6282-84 to seek equitable relief with regard
8 to the constitutionality of the procedures and policies in I&C
9 Manual §§ 6282-84.  The court does not certify a class of wards
10 to contend that the CYA has failed to implement or violates the
11 involuntary medication policies and procedures outlined in the
12 I&C Manual.

13              ii.   <u>Sex-Offender Treatment</u>

14     Carroll alleges that he has received inadequate sex-offender
15 treatment while housed at Mojave Hall, a unit for sex offenders
16 at Chaderjian.[26]   (SAC at ¶ 10).   Mojave Hall has an "informal"
17 sex offender treatment program.  (Parks Decl. Exh. I at 42).
18 Although the wards are offered some treatment services, no
19 "additional resources are allocated for mental health
20 professionals, increased staffing levels or increased training
21 for staff."  (<u>Id.</u>)  Significantly, the CYA itself concedes that
22 its informal sex offender treatment programs are "inconsistent
23 because of little or no clinical staff involvement" and achieve
24 "erratic" results.  (<u>Id.</u>)

25

26

---

[26] Mojave Hall also houses wards who have a history of being
sexually victimized.  (Parks Decl. Exh. I at 42).

1    The mental health care claims of wards who have been
2  committed as sexual offenders are sufficiently cohesive to permit
3  class certification under Rule 23(b)(2).  The CYA's informal sex
4  offender treatment programs all allegedly lack consistent
5  supervision by trained staff.  The court therefore certifies a
6  class of wards committed to the CYA by a juvenile court for
7  sexual offenses who are participating in or request to
8  participate in sex offender treatment programs, during the
9  pendency of this litigation to challenge the constitutional
10 adequacy of the CYA's sex offender treatment programs for wards
11 who have been committed for sexual offenses.

12               iii. <u>General Mental Health Care</u>

13    Plaintiffs also generally allege that the provision of
14 mental health care to CYA wards is inadequate due to problems
15 such as staffing shortages, a lack of space in special mental
16 health treatment units, and the CYA's failure to properly screen
17 wards for mental health problems.  (SAC at ¶¶ 66-75).  Although
18 the amended complaint also lists numerous other alleged
19 deficiencies in mental health services offered by the CYA, only
20 one named plaintiff, Striplin, makes specific allegations
21 regarding the provision of mental health care.  Striplin alleges
22 that he has been diagnosed with severe depression, schizophrenia,
23 and borderline personality disorder and has been on suicide watch
24 at Chaderjian where he is currently incarcerated.  (<u>Id.</u> at ¶ 25).
25 Striplin contends that while on suicide watch his visits with
26 psychiatrists rarely lasted longer than five minutes and that he

1  was not provided with any other counseling or treatment.  (Id.)

2      Because Striplin does not allege that he has received
3  inadequate mental health care while not on suicide watch, it is
4  unclear if he has standing to seek prospective relief with regard
5  to many of the treatment issues listed in the amended complaint.
6  As the plaintiffs' own materials indicate, the CYA provides
7  different levels of mental health care from inpatient intensive
8  treatment programs to residential counseling programs.[27]  (Parks
9  Decl. Exh. N).  The CYA's governing I&C Manual also contains
10 numerous detailed policies relating to the provision of mental
11 health care to wards.  (Templeton Decl. Exh. A).

12     Plaintiffs have not demonstrated that common issues of fact
13 or law link their various mental health care claims.  It is
14 uncertain, for example, if suicide prevention procedures should
15 be judged by the same legal standards as non-crisis psychological
16 counseling.  Nor is "mental health treatment" a particularly
17 clear concept.  Plaintiffs themselves exhibit some confusion over
18 whether substance abuse and sex offender treatment programs
19 should be characterized as mental health care or evaluated as
20 educational programming.  Furthermore, class members with
21 different mental illnesses may have specialized needs, and it is
22 doubtful whether Striplin's individual claim is typical of all of
23 the mental health claims asserted on behalf of the class.

24

25
      [27] For example the Redwood Lodge at Preston provides an
26 intensive treatment program to wards "who are acutely psychotic,
   severely suicidal, neurotic, or otherwise seriously handicapped
   emotionally."  (Preston Audit at 1, Parks Decl. Exh. F).

1    Instead of identifying a specific policy or practice that
2  affects all class members in accordance with Rule 23, plaintiffs
3  have simply pointed to a general area, the provision of mental
4  health services, where the CYA may need improvement.  There is
5  some evidence in the record suggesting that the CYA lacks
6  adequate funding and staffing to meet the mental health care
7  needs of some of its wards.  Undoubtedly, this is an important
8  topic that should be considered by the state legislature and by
9  state administrators.  But because the court is not a policy
10  making body, it can only adjudicate specific controversies.
11  Moreover, plaintiffs' claims are broad and mostly unrelated to
12  the individual claims of Striplin, the only class representative
13  with standing to assert mental health care claims.  Class
14  certification is accordingly denied.[28]

15    (6)  Programming and Education

16    Plaintiffs' programming and education claims are also
17  broadly framed, challenging the CYA's provision of a range of
18  programs from special education to exercise to substance abuse
19  treatment.  Plaintiffs do not identify, however, any common
20  question of law or fact that would justify the consolidation of
21  all of these claims into a single class action.  Not only is it
22  likely that different legal standards would apply to different
23  programs, it seems certain that plaintiffs' claims implicate
24

25      [28] In the absence of any specific evidence indicating that
26  wards on suicide watch are routinely denied counseling and
   treatment, the court declines to certify a narrow class based on
   Striplin's individual allegations.

1  numerous different CYA policies and procedures rather than a

2  unitary practice easily analyzed under Rule 23.[29]

3      For these reasons, the court declines to certify a single

4  all-inclusive programming and education class and will instead

5  focus on whether more narrowly defined classes can be certified

6  based on the specific allegations of the named plaintiffs.  Only

7  two named plaintiffs, Carroll and Owens, assert programming and

8  education claims.  Both are incarcerated at Chaderjian.  (SAC at

9  ¶¶ 10, 21).  Carroll alleges that his special education classes

10  at Chaderjian are frequently canceled due to high teacher

11  turnover, impeding his ability to earn a high school diploma.

12  (SAC at ¶ 11).  Owens contends that he was denied access to all

13  educational programs during a general lockdown at Chaderjian from

14  March to October 2001 and that he presently receives only 1.5 to

15  2 hours of daily education.  Owens also alleges that he is

16  currently allowed to exercise only in indoor cages.  (Id. at ¶¶

17  20-21).

18          i.   Special Education

19      Plaintiffs have presented evidence that teacher shortages at

20  some CYA facilities have prevented wards from receiving special

21  education services.  For example, both the October 2000 Stark

22  Audit as well as the January 2001 Nelles Audit indicate that the

23  "average percentage of wards receiving special education service

24  time is far below the 90% threshold set by the California Youth

25

26
    [29] Different CYA facilities also offer different academic
    and rehabilitation programs.  (Parks Decl. Exh. D).

1  Authority's Education Services Branch" and attribute the
2  deficiency to teaching and staff shortages.  (Stark Audit at 20-
3  23, Parks Decl. Exh. E; Nelles Audit at 14-16, Parks Decl. Exh.
4  G).  The Stark and Nelles audits, however, are over a year old,
5  and defendants argue that they do not reflect the current
6  situation at either facility.  (Defs.' Opp. to Pls.' Motion for
7  Class Cert. at 14).

8      Although the CYA admits that it "has had difficulty
9  attracting and retaining special education teachers at all its
10 facilities," it explains that staffing levels vary facility by
11 facility and asserts that most facilities do not have staffing
12 shortages.[30]  (Id.; Parks Decl. Exh. I at 58).  The CYA contends
13 that only two facilities, Stark and Preston, presently lack
14 sufficient special education staff.  (Defs.' Opp. to Pls.' Motion
15 for Class Cert. at 14).  Furthermore, in the initial grievance
16 filed by the plaintiffs, the majority of wards who allege that
17 they have received inadequate special education services are
18 incarcerated, like Carroll and Owens, at Chaderjian.  However,
19 the court has no other information about special education
20 staffing levels at Chaderjian.  Because the plaintiffs have not
21 demonstrated that there are systematic deficiencies in the
22 special education services provided by the CYA, the court
23

24     [30] In general, the audits submitted by plaintiffs suggest
   that the conditions at individual CYA facilities vary
25 substantially.  For example, although the Stark and Nelles audits
   identify problems in the provision of educational programs, the
26 February 2000 Preston Audit explains that the educational
   services at Preston significantly exceeded the standards set by
   the CYA.  (Preston Audit at 4, Parks Decl. Exh. F).

1  declines to certify a systemwide class based on the present

2  record.

3          ii.  <u>Provision of Education During Lockdown</u>

4          Similar considerations govern plaintiffs' lockdown claim.

5  As the Nelles and Stark audits note, there are "significant

6  periods when no academic or vocational education is provided" due

7  to administrative lockdowns and other security concerns.  (Nelles

8  Audit at 14, Parks Decl. Exh. G; Stark Audit at 20, Parks Decl.

9  Exh. E).  Defendants argue that classes at Stark and Chaderjian

10 are canceled more frequently for security reasons than classes at

11 other CYA facilities, because Stark and Chaderjian "house the

12 most disruptive and violent wards in the CYA system."  (Defs.'

13 Opp. to Pls.' Motion for Class Cert. at 15).  Indeed, ward

14 complaints about class cancellations on lockdown are mainly

15 centered on three specific facilities, Nelles, Stark, and

16 Chaderjian.  (Parks Decl. Exh. I at 58-66).  Based on Owen's

17 claim, the apparent frequency of lockdowns at certain CYA

18 institutions, and defendants' concession that lockdowns affect

19 educational programming, it might be possible to certify a class

20 of wards at Chaderjian who seek educational programs.  However,

21 plaintiffs do not seek certification of such a class.  Moreover,

22 it is likely that any injunctive relief accorded to Owens on his

23 individual claim would effectively benefit all wards at

24 Chaderjian even without certification of a class.

25

26

iii.   <u>Indoor Exercise</u>

Owens also alleges that he is not permitted to exercise indoors.  Defendants explain that the "[r]ecreational secure areas at Chaderjian are sometimes indoors."  (Parks Decl. Exh. I at 22).  Because there is no evidence of a systemwide CYA policy or practice of denying wards outdoor exercise, certification of a systemwide class is inappropriate.

(7)   <u>Procedural Due Process</u>

Plaintiffs allege that the CYA fails to provide adequate due process when: (1) disciplining wards through the Disciplinary Decision Making System ("DDMS"), (2) committing wards to lockup units or disciplinary housing, and (3) placing wards on temporary detention.  However, only one named plaintiff, Owens, asserts procedural due process claims, and his claims relate solely to confinement in lockup units.[31]  (SAC at ¶ 20).  Because Owens lacks standing to seek injunctive relief with regard to DDMS and temporary detention procedures, he cannot represent a class

---

[31] Plaintiffs argue that Stevens, Martinez, and Jindherd also assert discipline claims.  (Pls.' Reply in Support of Class Cert. at 14-15).  Stevens alleges that he was disciplined after reporting that he had been sexually assaulted by two other wards. (SAC at ¶ 5).  Martinez contends that he was threatened with a disciplinary report when he refused to disclose confidential legal mail.  (<u>Id.</u> at ¶ 19).  And Jindherd alleges that he has been disciplined regularly because he cannot understand oral announcements of rule changes without a sign language interpreter.  (<u>Id.</u> at ¶ 5).  It is unclear from these allegations, however, if Stevens, Martinez, and Jindherd actually seek to bring procedural due process claims relating to the CYA's DDMS system.  In any event, because there is scant evidence in the record indicating a pattern of arbitrary or retaliatory discipline of wards, plaintiffs have not meet the requirements for Rule 23(b)(2) class certification on any discipline claims.

1   seeking to assert these due process claims.   See Wooden, 247 F.3d
2   at 1288.

3        Owens alleges that he was confined in lockup units at Stark
4   and Chaderjian for five months from September 2000 to January
5   2001 without a hearing to determine the necessity of his
6   confinement.   (SAC at ¶ 20).   Owens also asserts that he was
7   placed in a lockup unit reserved for wards who have committed
8   rule violations, purportedly for his own protection, from March 6
9   to April 23, 2002, without the ability to challenge his
10  placement.   (Id.)

11       According to CYA policy, wards may be placed in lockup units
12  for their own protection without a hearing and without an
13  opportunity to challenge the placement.   (Parks Decl. Exh. I at
14  33).   The validity of this policy raises a common legal issue,
15  and Owen's individual claim will be sufficiently comparable to
16  the claims of the other wards subject to the policy to make class
17  certification appropriate.   The court thereby certifies a class
18  of all wards who have been placed in lockup units during the past
19  year, for their own safety, without a hearing or other
20  opportunity to challenge their placement, to challenge the
21  constitutionality of this policy.   The court declines to certify
22  a broader class because there is insufficient evidence in the
23  record suggesting that the CYA has a policy or practice of
24  generally confining wards in lockup units without a hearing.
25
26

VII.

Defendants' motion to dismiss the plaintiffs' individual claims is GRANTED in part. Because they have not established a likelihood of imminent injury, the following plaintiffs' individual claims are DISMISSED: (1) Angel Martinez's failure to protect claim, (2) Raymon Davis's excessive force claim, (3) Jermaine Brown's physical facilities and lockup claims, and (4) Chris Stevens's mental health care claim. In addition, Khalil Jinherd's verbal harassment claim is dismissed for failure to state a claim. Defendants' motion to dismiss plaintiffs' claims is DENIED on all other grounds.

As plaintiffs have agreed to dismiss the claims of Michael Rensendiz and Randy Jones, these claims are DISMISSED.

Defendants motion for summary judgment on Amy Stephens's denial of medical care claim is GRANTED. Stephens's claim for injunctive relief is DISMISSED as moot.

Plaintiffs' motion for class certification is GRANTED in part. The court certifies the following classes:

(1)   A class of all CYA wards who have been forcibly medicated with a psychotropic drug during the past year without an initial hearing under I&C Manual §§ 6282-84 to seek equitable relief with regard to the constitutionality of the procedures and policies in I&C Manual §§ 6282-84.

(2)   A class of wards committed to the CYA by a juvenile court for sexual offenses who are participating in or request to participate in sex offender treatment programs, during the pendency of this litigation to challenge the constitutional adequacy of the CYA's sex offender treatment programs for wards who have been committed for sexual offenses.

57

(3)   A class of all wards who have been placed in lockup
      units during the past year, for their own safety,
      without a hearing or other opportunity to challenge
      their placement, to challenge the constitutionality of
      this policy.

Plaintiffs' motion for class certification is DENIED as to all

other claims.

    IT IS SO ORDERED.

Dated:   *10 September 2002.*

                                    _____
                                    DAVID F. LEVI
                                    United States District Judge

United States District Court
for the
Eastern District of California
September 11, 2002


* * CERTIFICATE OF SERVICE * *


2:01-cv-00675


Stevens

    v.

Harper

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  September 11, 2002, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Donald Specter                          HV/DFL
Prison Law Office
General Delivery                        Writ Clerks
San Quentin, CA  94964

Sidney Wolinsky
Disability Rights Advocates
449 15th Street
Suite 303
Oakland, CA  94612-2821

Richard B Ulmer Jr.
Latham and Watkins
135 Commonwealth Drive
Menlo Park, CA  94025

Caroline N Mitchell
Pillsbury Winthrop LLP
PO Box 7880
50 Fremont Street
Fifth Floor
San Francisco, CA  94105

Monica Noella Anderson
Attorney General's Office
PO Box 944255

1300 I Street
Suite 125
Sacramento, CA  94244-2550

Stephen Peter Acquisto
Attorney General's Office
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Jack L. Wagner, Clerk

BY: _____
    Deputy Clerk